**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Michael D. MILTON, Defendant–
Appellant.**

**No. 93–1522.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 27, 1994.

Decided June 14, 1994.

Rehearing Denied July 18, 1994.

Patrick E. Corbett, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Detroit, MI, for plaintiff-appellee.

Rita C. Martin (argued and briefed) and Jill L. Price, Federal Public Defenders Office, Detroit, MI, for defendant-appellant.

Before: KEITH, RYAN, and DAUGHTREY, Circuit Judges.

KEITH, Circuit Judge.

Defendant–Appellant Michael D. Milton ("Milton") appeals his conviction and sentence for felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Milton argues the sentencing court erroneously cross-referenced his possession offense to the second degree murder Guideline based on acquitted conduct, and that the sentencing court should have imposed his federal sentence *nunc pro tunc* with his state sentence. For the reasons stated below, we **AFFIRM** his conviction and sentence.

## I.

On September 26, 1992, Milton and his friend Lorenzo Colbert ("Low") met at Milton's Burt Street residence in Detroit, Michigan and arranged to sell drugs to Melvin Beasley ("Beasley"). Unbeknownst to Beasley, Milton planned to sell him chalk instead of cocaine. Later that day, Milton and Low, both armed with .45 caliber semi-automatic pistols, met Beasley and Anthony Fountain ("Fountain") at a gas station and completed the deal. Beasley paid Milton $2,700 for the chalk. After the deal, Milton and Low left the gas station to return to Burt Street.

After Beasley discovered the drugs were fake, he followed Milton and Low. At a stoplight, Beasley pulled alongside Milton's and Low's car. Before any conversation occurred, Fountain saw Low cock his gun and he ducked under the dashboard. From where Fountain hid, he heard four shots fired. During the shooting, Beasley was shot in the head and later died from his wounds.

Two days later, the Detroit Police executed a search warrant at Milton's Burt Street residence where they recovered Milton's gun and arrested him. Once in custody, Milton gave a statement about the events and admitted he knew Beasley and had arranged the fake drug deal. When questioned about the shooting, Milton stated:

A: While I was stopped at the light, Melvin [Beasley] pulled up next to us on the right side. Melvin just looked at me, like saying, man, why did you do this to me. As Melvin had pulled up, Low rolled down the window. Then the light turned green. I was starting to turn infront [sic] of traffic to run. Before I started to turn and while Melvin was looking at me the way he was, I fired one shot that broke out their rear door window of the car Melvin was in. I aimed to shoot the back window out just to scare him. Then I started the turn, that's when Low pointed his gun out the window and fired two shots that I'm sure of. As I turned and was going down French Road, I saw the car still there at the light. I just saw the front of the car. I didn't see that Melvin had been shot.

Q: What type of gun did you fire into Melvins [sic] car.

A: It was a black .45 automatic.

Q: Where is that gun at now.

A: It was on Burt Rd., but I think the police got it now.

Q: What type of gun did Low have.

A: It was also a black .45.

Q: Where is the gun Low had.

A: He should have it.

\* \* \* \* \* \*

Q: Did Low say anything about the shooting at all.

A: Low was just saying, 'I killed him, I killed him, killed both of them.' I told Low he didn't kill them, he just shot through the window.

In July 1990, the State of Michigan charged Milton with second degree murder. After a bench trial, Milton was acquitted of second degree murder but convicted of felonious assault and the use of a firearm during a felony.

In March 1992, a federal grand jury returned an indictment charging Milton with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). In June 1992, the government filed a notice classifying Milton as an armed career criminal, thus subjecting him to a mandatory minimum sentence of 15 years imprisonment, and a maximum of life imprisonment. *See* 18 U.S.C. § 924(e).[1]

On September 28, 1992, a jury trial commenced in the Eastern District of Michigan. At trial, Detroit Police officer Robert Collinash testified that he found two spent casings at the scene of the crime. Firearms expert, Bernell Fair, testified that the two casings were shot from Milton's gun. Experts were unable to identify the origin of the bullet removed from Beasley's head because it was too badly damaged. After a two day trial, the jury convicted Milton.

Milton's presentence investigation report ("PSI") recommended a base offense level of 33 with a Guideline range of 168–210 months.[2] Milton objected to the PSI base offense level calculation. The Guideline applicable to felon in possession convictions contains a cross-referencing provision. *See* U.S.S.G. § 2K2.1(c)(1). The PSI cross-referenced the Guideline for second degree murder. *See* U.S.S.G. § 2A1.2. The sentencing court found it was reasonably foreseeable from Milton's actions of shooting into Beasley's car that someone could be killed. Based on this reasoning, the judge cross-referenced the second degree murder guideline. Milton's base offense level, coupled with his armed career criminal status, increased his Guideline range to 180–210 months.

---

1. At trial, both parties stipulated Milton been convicted of heroin delivery which is a felony. JA p. 135.

2. The Probation Officer calculated Milton's sentence under the 1988 version of the Guidelines because of *ex post facto* problems. Notably, had Milton been sentenced under the 1992 Guidelines, as an armed career criminal he would have been subject to a base offense level of 34 and with an imprisonment range of 262–237 months. *See* U.S.S.G. § 4B1.4.

In April 1993, over Milton's objections, the district court adopted the PSI recommendations and sentenced Milton to 195 months imprisonment. The sentencing judge imposed Milton's federal sentence concurrent to his remaining state sentence. On April 5, 1993, Milton filed a timely notice of appeal.

## II.

On appeal, Milton argues the trial court erred by: (1) cross-referencing the second degree murder guideline where the government failed to prove the elements of second degree murder by a preponderance of the evidence; (2) sentencing him based on conduct for which he had been acquitted in state court; and (3) refusing to impose his federal sentence *nunc pro tunc*[3] with his state sentence. We discuss each allegation of error below.

## A.

Milton first argues the district court erred by cross-referencing the guideline for second degree murder. Additionally, Milton asserts the government did not prove, even by a preponderance of the evidence, that his actions reached the level of second degree murder. We disagree.

The district court sentenced Milton pursuant to the United States Sentencing Guidelines. We review applications of the Guidelines *de novo*. *See United States v. Hicks*, 4 F.3d 1358, 1360 (6th Cir.1993)(citing *United States v. Sanchez*, 928 F.2d 1450, 1458 (6th Cir.1991)).

Section 2K2.1(c)(2)[4] provides that where the defendant used or possessed the firearm in committing or attempting to commit another offense, the court should cross-reference and apply the Guideline for the other offense if the resulting offense level is higher. Here, the district court found that the conduct underlying the possession offense was second degree murder. Because the offense level for second degree murder was higher than that for felon in possession, the sentencing court cross-referenced second degree murder. *See* U.S.S.G. § 2A1.2.

■ District courts must consider whether a defendant's conduct satisfied the Guidelines' definition of the cross-referenced offense. *See United States v. Smith*, 910 F.2d 326, 330 (6th Cir.1990). For Guidelines purposes, 18 U.S.C. § 1111(a) defines murder as "the unlawful killing of a human being with malice aforethought." *See* U.S.S.G. § 2A1.2 (stating the Guidelines definition of second degree murder appears at 18 U.S.C. §§ 1111 and 1112). First degree murder is defined as any murder "perpetrated by poison, lying in wait, or any kind of wilful, deliberate, malicious, and premeditated killing." *See* 18 U.S.C. § 1111(a). Second degree murder is defined as any other murder. *Id.* Second degree murder, therefore, requires a finding of malice aforethought. *See United States v. Bordeaux*, 980 F.2d 534, 536 (8th Cir.1992), *United States v. Lesina*, 833 F.2d 156, 159 (9th Cir.1987)(citing *United States v. Celestine*, 510 F.2d 457, 459 (9th Cir. 1975)).

■ The Sixth Circuit has not heretofore defined malice aforethought. Other courts of appeals, however, have defined malice aforethought. The Eighth Circuit stated that "[m]alice may be established by evidence of conduct which is 'reckless and wanton, and a gross deviation from a reasonable standard of care, of such nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" *See United States v. Black Elk*, 579 F.2d 49, 51 (8th Cir.1978)(citing *United States v. Cox*, 509 F.2d 390, 392 (D.C.Cir. 1974)). The Ninth Circuit defined malice aforethought as including "the state of mind with which one intentionally commits a wrongful act without legal justification or excuse." *United States v. Celestine*, 510 F.2d 457, 459 (9th Cir.1975). The *Celestine*

---

**3.** Where an incarcerated defendant receives a second sentence based on the same conduct, some states allow the imposition of the second sentence to be *nunc pro tunc*. This allows the second sentence to date back to the starting date of the first sentence and credits the defendant for time served.

**4.** As noted *supra*, all references to the Guidelines refer to the 1988 version due to *ex post facto* problems.

panel further noted that malice aforethought "may be inferred from circumstances which show 'a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences.'" *Id.*

The record below shows no discussion of malice aforethought. In fact, at sentencing, the government never mentioned malice but instead argued Milton should be held accountable for second degree murder as relevant conduct.[5] The government relied on language from an application note to the relevant conduct provision and the following colloquy took place:

> The Court: As I recall the testimony in this case, it was that Mr. Milton and his cohort drove up to or the other car drove up to them after they discovered that the substance that was sold was not in fact cocaine and Mr. Milton claims that he fired his gun to scare off the other guy, toward the back of the car ...
>
> Let me ask you a question, had he been convicted of manslaughter, what would be the relevant conduct that would be applicable?
>
> Govt.: I think what you need to do, your honor, is simply go with the facts as it's been—as it's been laid out before you.
>
> The Court: Do you know the answer to that question?
>
> Govt.: I would say it would be the same result. ... The second degree murder guideline is what we would be intending to apply. Because if the court had found manslaughter or felonious assault or simple assault, we still see the facts as being second degree murder by a preponderance of the evidence. And it's important in evaluating this, your Honor, to not only look at it from simply a perspective of whether or not Michael

Milton, defendant, fired a gun that resulted in the bullet in Melvin Beasley's head but whether Michael Milton engaged in *relevant conduct that would allow him to be held accountable for conduct of others that he jointly undertook a criminal activity with, conduct of others that was reasonably foreseeable by Michael Milton* ....

> The relevant conduct provision here brings Michael Milton into this determining whether or not he, by a preponderance of the evidence was a part of a 2nd degree murder, that you should hold him accountable for. The relevant conduct provision brings this all in as a preponderance of the evidence standard ... he should be brought in as a person who should be held responsible for second degree murder. The reality is we don't know whether the bullet that was in Melvin Beasley's head was from Michael Milton's gun or from his passenger's gun ... Plus it doesn't matter ... he would be held accountable under the relevant conduct standard, for conduct that was jointly undertaken by him with another and that acts in furtherance of that conduct were reasonably foreseeable by the defendant. That's the standard under the relevant conduct provision.

(JA p. 157–60)(emphasis added).

The government did not argue that Milton acted with malice aforethought but instead recited the language of the relevant conduct provision. The district court relied on the above argument and made no findings about whether the elements of second degree murder had been proven. The sentencing court specifically found:

> The Court: [The Government's] argument on the appropriate relative

**5.** The relevant conduct provision provides, inter alia:

    (a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, ... cross references in Chapter Two shall be determined on the basis of the following:

      (1)(A) all acts and omissions committed, or aided and abetted by the defendant or for which the defendant would otherwise be accountable.

U.S.S.G. § 1B1.3. An application note defines activity "for which the defendant would otherwise be accountable," as including "the conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." *See* U.S.S.G. § 1B1.3 comment. n. 1.

(sic) conduct to consider has one, in my view—has one, in my view, prevailing determinative factor, and that is the question of whether or not the facts, as I recall them from trial, establish by a preponderance of the evidence, that the death of Mr. Beasleyly (sic) was reasonably foreseeable from your [Milton's] actions in shooting into the car.

I hadn't really focused on that, but in focusing on that now, I believe that although that may not be provable beyond a reasonable doubt, as apparently the state judge found, I believe it is provable and I accept it by a preponderance of the evidence. I believe that whenever anyone fires a gun at something with people in it, it is reasonably foreseeable the outcome, and in view of that finding ... that I make (sic) take into account as relevant conduct unconvicted or acquitted conduct, I am going to apply the murder guideline, the 2nd degree murder guideline.

I believe that in view of the circumstances, it would be reasonably foreseeable to a rationale (sic) person that if you shoot a gun at a car with people in it, somebody may get killed. And for that reason, I find the murder guideline applicable.

(JA p. 173).

Here, the district court held a man accountable for second degree murder using a foreseeability standard. We are disturbed by the district court's failure to make any findings relevant to the elements of second degree murder. The court did not find that Milton acted with malice aforethought—in fact, no reference to malice aforethought appears within the sentencing transcript. District courts should consider specifically the elements of cross-referenced conduct.

Although the district court erred by failing to make specific findings as to the elements of second degree murder, we review applications of the Guidelines *de novo*, and therefore must find that Milton's actions indicate he acted with malice aforethought. Milton, unprovoked, fired at least two shots into the victim's car. Despite Milton's statement that he only meant to scare Beasley, from his actions we infer that he must have been aware of a risk of death or serious bodily injury. Milton's gross deviation from a reasonable standard of care established the requisite malice aforethought to hold him accountable for second degree murder. Based upon a *de novo* review of the record, we find Milton's actions satisfied the requisite elements and we affirm the district court's cross-reference to the second degree murder Guideline.

### B.

Milton next argues the district court erroneously based his sentence on conduct for which he had been acquitted. We disagree.

The Ninth Circuit is the only circuit which explicitly disallows sentencing based on acquitted conduct because it permits a sentencing court to reconsider facts that have been rejected by a jury's not guilty verdict. *See United States v. Brady*, 928 F.2d 844 (9th Cir.1991).[6] Milton asks this court to adopt the *Brady* reasoning. He argues that unless this court adopts *Brady*, the protections of due process and the right to trial by jury are reduced to hollow promises.

This circuit clearly allows district courts to consider acquitted conduct at sentencing. *See United States v. Duncan*, 918 F.2d 647, 652 (6th Cir.1990)(upholding enhanced penalty for possession of a firearm during a drug crime even though defendant was acquitted of the § 924(c) count at trial), *cert. denied,*

6. In *Brady*, the defendant was indicted for first degree murder and assault with intent to commit murder. The jury convicted him of the lesser included offenses of voluntary manslaughter and assault with a dangerous weapon. The sentencing court departed upward from the Guideline range based on the defendant's state of mind because the court found the defendant intended to kill the victim. The Court of Appeals, reasoning that sentencing based on a defendant's intent to kill would result in punishing the defendant for an offense for which he had been acquitted, remanded stating: "we would pervert our system of justice if we allowed a defendant to suffer punishment for a criminal charge for which he or she was acquitted." *Brady*, 928 F.2d at 844.

500 U.S. 933, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991). We consider acquitted conduct under the theory that a determination of guilt requires proof beyond a reasonable doubt while sentencing considerations only require proof by a preponderance of the evidence. *See United States v. Moreno,* 933 F.2d 362, 374 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991). Because we are bound by the decisions of prior panels, we decline to adopt the *Brady* rationale. The district court did not err by sentencing based on acquitted conduct.

### C.

Milton finally argues the district court should have given him credit for the time served on his state sentence. Milton specifically asserts that because both the federal and state sentences involved the same underlying conduct, his federal sentence should have been imposed *nunc pro tunc* from the date he began serving his state sentence. Milton relies upon a 1992 amendment to U.S.S.G. § 5G1.3 and an accompanying application note which require an "adjustment" for sentences based on the same underlying conduct. Milton's argument lacks merit for several reasons, each discussed below.

The district court made the following findings regarding Milton's argument that it should run the sentences *nunc pro tunc:*

> The Court: I don't think there's anything that requires me to do that. I don't—as a matter of policy, I don't think that's good policy to do that. My policy has always been, in the absence of mandate such as the sentencing guidelines here, to run sentences consecutive, different convictions receive consecutive sentences. That's always been my policy.
>
> Now, where the underlying state case gave rise to the same—the transactions in the underlying state case gave rise to the same conviction as the Federal case, obviously that's something different. But the issue of running it nunc pro tunc back to the date of the commencement

of the state sentence, I see no basis in policy for that.

(JA p. 163). The district court then declined to impose the sentence *nunc pro tunc* but agreed to run Milton's sentence concurrent with the remainder of his state sentence.

The district court properly noted that no statutory provision exists requiring the imposition of federal sentences *nunc pro tunc* with state sentences. Thus, we must examine the Guideline most relevant to crediting a defendant for state time served. U.S.S.G. § 5G1.3 addresses the imposition of a sentence where a defendant is serving an unexpired term of imprisonment. The 1988 version of § 5G1.3 provided as follows:

> If at the time of sentencing, the defendant is already serving one or more unexpired sentences, then the sentences for the instant offense(s) shall run consecutively to such unexpired sentences, unless one or more of the instant offense(s) arose out of the same transactions or occurrences as the unexpired sentence. In the latter case, such instant sentences and the unexpired sentences shall run concurrently, except to the extent otherwise required by law.

Other courts of appeals that have considered whether the 1987–1988 version of § 5G1.3 deprived the sentencing court of discretion to choose between consecutive and concurrent sentences have unanimously concluded that the court retains the power to make such a choice. *See, e.g., United States v. Miller,* 903 F.2d 341, 345–49 (5th Cir.1990)(collecting cases). A recent panel of this court held that we review a decision to order consecutive or concurrent sentences under § 5G1.3 for an abuse of discretion. *See United States v. Devaney,* 992 F.2d 75, 77 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 237, 126 L.Ed.2d 191 (1993).

Milton seeks to benefit from a 1992 amendment to § 5G1.3. An application note interpreting the amendment directs the sentencing court to "adjust for any term of imprisonment already served as a result of the conduct taken into account in determining the sentence for the instant offense." U.S.S.G. § 5G1.3, comment. n. 2.[7] Milton argues that

---

**7.** An application note provides an example of this    "adjustment":

because this amendment clarifies § 5G1.3, the district court should have followed its logic. We disagree for several reasons. Here, Milton was sentenced under the 1988 Guidelines manual. Unless the amendment was clarifying, as discussed below, both the Guidelines and case law prohibit giving Milton the benefit of both the 1988 Guidelines range and the 1992 amendment.

■ First, we note that Milton was properly sentenced under the 1988 version of the Guidelines Manual. Normally, the sentencing court must use the Guidelines in effect at the time of sentencing. 18 U.S.C. § 3553(a)(4). We recognize an exception to this rule "when the Guidelines in effect at the time of sentencing provide for a higher range than those in effect at the time the crime was committed ... an *ex post facto* problem exists and the court must not impose a sentence in excess of that allowed by the older guidelines." *United States v. Nagi,* 947 F.2d 211, 213 n. 1 (6th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992). The 1992 Guidelines significantly increase the Guideline range of imprisonment for Milton's crime.[8] Thus, the district court properly sentenced Milton under the 1988 version.

■ Next, the Guidelines direct that the manual "in effect on a particular date shall be applied in its entirety." U.S.S.G. § 1B1.11 p.s. Additionally, other circuits forbid piecemeal application of sections from different Guidelines manuals. *See United States v. Warren,* 980 F.2d 1300 (9th Cir. 1992) (holding that sentences should be determined under one set of guidelines rather than piecemeal); *United States v. Stephenson,* 921 F.2d 438 (2d Cir.1990)(affirming the use of the Guidelines manual effective at the time the crime was committed as a whole); and *United States v. Lenfesty,* 923 F.2d 1293 (8th Cir.), *cert. denied,* 499 U.S. 968, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991)(rejecting defendant's request to receive application of favorable change in the Guidelines while continuing to receive the benefit of a provision under a previous version of the Guidelines).

■ Further, the 1988 and 1989 versions of § 5G1.3 both contained discretionary language. The Ninth Circuit, discussing the changes to § 5G1.3 from 1989 to 1992, held such changes were clearly substantive rather than clarifying. *See United States v. Warren,* 980 F.2d 1300, 1303 (9th Cir.1992), *cert. denied,* — U.S. —, 114 S.Ct. 397, 126 L.Ed.2d 344 (1993). The application note, therefore, does not merely "clarify" the 1988 Guidelines. The panel in *Warren* specifically stated that the earlier version of § 5G1.3 and 1992 version "differ dramatically" and "[t]he revised version of § 5G1.3 applies to many more situations and allows for much less discretion." *Id.; see also United States v. Ogg,* 992 F.2d 265, 267 (10th Cir.1993)(holding amendments to 5G1.3 were substantive and should not be considered). We agree with the logic of our sister circuits finding that the amendments were substantive.

■ Finally, because Milton asked the district court to use the 1988 version of the Guidelines and did not object to using the 1988 version below, by his actions, he forfeited any right he might have had to being sentenced under the newer Guidelines. *See Nagi,* 947 F.2d at 213–14 (holding defendant waived right to appeal sentence under a specific Guidelines manual when he agreed to application of that manual at sentencing).

*Example:* The defendant has been convicted of a federal offense charging the sale of 40g cocaine. Under 1B1.3 (relevant conduct), the defendant is held accountable for the sale of an additional 15g of cocaine that is part of the same course of conduct for which the defendant has been convicted and sentenced in state court (the defendant received a nine-month sentence of imprisonment, of which he has served six months at the time of sentencing on the instant federal offense). The guideline range applicable to the defendant is 10–16 months ... The court determines that a sentence of 13 months provides the appropriate total punishment. Because the defendant has already served six months on the related state charge, a sentence of seven months, imposed to run concurrently with the remainder of the defendant's state sentence, achieves this result.

8. Because Milton qualified as an armed career criminal, the 1992 version would have subjected him to U.S.S.G. § 4B1.4. That guideline requires that Milton receive a base offense level of 34 with an imprisonment range of 262–327 months rather than the range of 180–210 months within which Milton was sentenced.

We note that Milton does not now appeal the district court's use of the 1988 version of the Guidelines. We, therefore, hold that the district court properly sentenced Milton under the 1988 version and properly refused to consider the 1992 amendment to § 5G1.3.

It is interesting, however, to compare Milton's options under both versions. At the time of his federal sentencing, Milton had served two years in state prison. Under the 1988 Guidelines, without the benefit of the 1992 "adjustment" provision, Milton received 195 months to run concurrent with the remainder of his state sentence. Had the 1988 Guidelines credited Milton for his time served for the same conduct, his minimum possible sentence would have been 180 months due to his armed career criminal status. Applying the 1992 version in its entirety, however, Milton's range of incarceration increases to 262–327 months. Assuming the court sentenced him to the *minimum* within this range—262 months—and credited him for his time served in state prison, Milton would have received 238 months incarceration—43 months longer than the actual sentence imposed. Thus, Milton's best interests are served by applying the 1988 Guidelines rather than the 1992 Guidelines which incorporate the "adjustment."

We recognize that under the 1988 Guidelines, the district judge retained full discretion to impose Milton's federal sentence consecutive to his state sentence. Instead, the district judge ran Milton's state and federal sentences concurrently. Under the circumstances of this case and the requirements of the Guidelines, we find the district court did not abuse its discretion by refusing to impose Milton's sentence *nunc pro tunc.*

### III.

For the reasons stated above, we **AFFIRM** the jury conviction and the sentence imposed by the Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan.